1338-03, 1340-14, 1338-03, 1340-19, 1340-81, 1340-86, U.S.A. v. Darin Wright, U.S. Congress, 1340-1, 1340-1, 1340-2, 1340-3, 1340-4, 1340-5, 1340-6, 1340-7, 1340-8, 1340-9, 1340-10, 1340-11, 1340-8, 1340-9, 1340-9, 1340-10, 1340-11, 1340-12. I think I'm going to do eight minutes and reserve two minutes of rebuttal, or in seven. Okay. So there's been agreement for the… We've all agreed we met before, yes. All right. Very well. Okay. All right. You may proceed. So, as I was preparing this argument, I started looking at the law, which I think we all pretty much can agree is pretty consistent and there's… I don't think many of the parties will disagree as to what the law is. But if you look at the actual words, what they say with respect to a wiretap, only if normal investigative procedures have been, one, tried and failed, two, unlikely to succeed if tried, and two, dangerous. So when you look at that and ask, did the government give serious consideration to non-wiretaps as it relates to Dale Colbert, and Dale Colbert alone, we would first look at what the government did do. And I think we would agree that they used a confidential source, number six, who told them about… told them information about the Colberts in California. The agents were conducting this investigation in the Canton-Akron area, and by virtue of phone conversations, heard about something that occurred in California. So in fact, they did have some information from a confidential source. What did they then do before they asked for the wiretap? They did some surveillance. They did absolutely no surveillance in California, but they did do it in the Akron-Canton, and yes, in fact, on February 21st, they saw my client at 1338 Newton in Akron, where ultimately drugs were received, and they also saw him on February 23rd in Akron. They did subpoena his bank records, however, they did not receive them before authorizing the wiretap. They then, in fact, did do a search warrant on March 12th, where they recovered drugs. So they absolutely did do something, but how much did they really do? When you look at the case law, 2518 and Rice, it lays out certain things that the government and or the agents can do or should do when determining whether or not to allow a Title III intercept. First thing is, they talk about trash pulls. With respect to my clients, they knew where they lived in California, but they did do absolutely no trash pulls there. Did they do any surveillance with respect to them? Yes, as I previously mentioned, those two dates in Akron, but again, they did absolutely nothing in California with respect to Dale Colbert. Did they do anything with respect to GPS? They did nothing with respect to that in the Akron-Canton area. Also, they did absolutely nothing in terms of any of that activity in California. As we know, the government has broad powers. They certainly could have done something to see what was going on in California. They chose not to. They did subpoena some bank records, but prior to the March 12th, they had not received them. They could have gone to Ortega, where these shipments allegedly started in California, done some sort of investigation with respect to Ortega out in California. They didn't. They could have done some investigation with respect to the alleged carrier of these drugs, YRC, but they did do absolutely nothing. At this time, they did have five or six cooperating witnesses, five of whom had nothing to say with my client, only one of whom talked about my client. They could have done some grand jury investigation, but they chose not to. They could have used undercover agents, again, both in Akron and California, but they chose not to. They could have done some consensual phone recording, but they didn't do that. They made no controlled buys. So our argument is that they did very little with respect to Dale Colbert in the Akron-Canton area, and yet they did absolutely nothing with respect to Dale Colbert in California. And for those reasons, I think that the motion that we should...is...the denial of the motion was inappropriate. Thank you. All right. Mr. McDonald, before you leave, you're appealing the denial of the district court of the motion to suppress. Correct. But you're really challenging the sufficiency of the affidavit. Yes. The Title III order allowing the wiretap. What is our standard of review of reviewing the sufficiency of that affidavit? The sufficiency, when you review that, I wrote, it's an abuse of discretion. Thank you. Thank you. Good morning. Good morning, Your Honors. Excuse me. Dry. Good morning, Your Honors. Anthony Vey on behalf of Jeremy Duncan. I'm here primarily to speak of the necessity part of the requirements of the Title III wiretap statute. I'd like to give you a brief overview of the conspiracy or conspiracies that were alleged in the indictment. And basically what you have is you have two West Coast drug trafficking organizations. One, because of sensitivity, one I will call the T Drug Trafficking Organization and the other one was the Colbert Drug Trafficking Organization. Those drug trafficking organizations, especially the T Drug Trafficking Organization, would transport marijuana to the Akron area. The Colbert Drug Trafficking Organization would primarily transport cocaine to the Akron area. The receivers of the contraband or the resellers of the contraband were Branch, Logan and Wright. According to Special Agent Perini, Duncan was the courier for the T, California T Drug Trafficking Organization. He was not part of the Colbert Drug Trafficking Organization. What Jeremy Duncan actually did for a living is he was an over-the-road truck driver, and I think this becomes important down the road a bit, no pun intended. He had a business, thank you Judge, Z&L Trucking. He had a truck, a tractor-trailer truck, a big huge semi-tractor-trailer truck. He had a place of business, he had a home, and it was located in the California, greater Los Angeles area, Southern California. There was a total of 10 wiretaps issued in this case. The first one beginning in December 7, 2011. The last one, which involved my client, was issued in May of 2012. My client was heard on some of the other intercepted calls, but my primary focus here is TT9, which is the order of his personal phone to be tapped. Court is well aware of the law. Obviously great deference is paid to the determination of the issue, and the judge panel knows that. I'd like to focus on the physical surveillance part of the Preeny affidavit. There was no physical surveillance whatsoever done except by happenchance one time in Akron of my client. There was no GPS tracking of my client's vehicle. In Preeny's affidavit, he states that in obviating the necessity of GPS and or surveillance, he says that the physical location of these persons alone is insufficient to reveal actual criminal conduct. Only wiretap conversations reveal that the meaning is derived from the location of the individuals. In other words, the only way we can figure out what Duncan is doing is by wiretapping his cell phone. Your Honor, that just simply is not true, and it doesn't make sense.  He had the goods. He had the marijuana. His location is the location or the possible location of the whole focus of the investigation, which is contraband, and on the TDTO side would be marijuana. The government knew where Jeremy Duncan lived. They knew exactly the make and model of his semi-tractor trailer. They knew they had the ability to track him wherever he went, but yet there was no effort made to either surveil him through law enforcement agents or to GPS track him. And I think, as I say in the brief, that that alone requires reversal. Thank the Court. Good morning, Your Honors. May it please the Court, Tom Conway. I represent the appellant, Darrell Colbert. I'm going to use all my time at this point, not reserve any. Your Honors, I had two arguments that I made in my brief. The one that I feel is the one that I would like to highlight a few significant things this morning is the necessity argument. I went through and I tried to go wiretap, affidavit by affidavit, showing what exactly was done in each instance by the government agent, as well as pointing out that there were a number of what I've referred to as either false statements in the affidavit and or omissions. And by false statements, I'm not in any way implying that the agent knowingly made up any of this. I believe these were statements that are not true from our point of view, and the fact that they were included in the affidavit had two effects. Number one, it made to the issuing judge, which abuse of discretion is the appropriate standard, it made it seem that the traditional forms of investigation might be too dangerous. And there were three statements that were put into these different affidavits pertaining to Darryl Colbert, number one, being a member of a national violent, very violent street gang, the Crips. Number two, that he was known as a cocaine trafficker, and I know there is a dispute between myself and the government as to the semantics of that. My argument is the way it was presented to the issuing judge connotated that the agent himself at that point was aware, had personal knowledge, that in fact ongoing cocaine distribution was being undertaken by Darryl. Yes? You've identified in your brief these statements you've talked about a couple of now that you say are false. Yes. I understand you are telling us they're false in your brief that's signed by you, but is there evidence in the record that was presented to the district judge that a piece of evidence that showed that judge that this is false, separate and apart from your client's attorney, if it was you at the time, saying, hey judge, this is just not right? And I know that that's the main hurdle I face at this point, is I don't have any extrinsic evidence apart from the affidavits which I could offer the district court at that time. What I was trying to argue in my brief to the district court was that the inherent contradictions included within these affidavits offered by the government was that preliminary, substantial preliminary showing necessary to gain a Franks hearing. For instance, and I know that the courts, especially the 6th District, that there's a higher standard that applies to omissions as opposed to affirmative false statements, but there were two omissions that were not brought out by the agent in his affidavits. The affidavits themselves show that those omissions occurred and they were substantial and the lack of those does not give the issuing judge a complete truthful picture of the situation when he's deciding whether something's necessary. Those two are the fact that in all of these conversations that my client was involved in, I was amazed. Personally, there's no talk of violence, there's no insinuations of violence towards anyone, there's no mention of any weapons, there's no mentions of any vendettas or even any kind of subtle threats. There were significant volumes of telephone conversations that were involved in this case, including they had another informant, CS6. I find that remarkable that in the nature of this type of alleged trafficking at that point that the government was looking at, the lack of any connotation of violence, because usually that is part and parcel of this type of enterprise. The second... How does that have to do with the issuance of the wiretap? Well, because I think that goes to the necessity argument. If in fact... No. No, that's... The wiretap goes to the necessity of gathering the evidence, and the violence, they may have an increased sentence if they're violent, but the crimes are committed whether they're violent or not, right? No, I understand, Your Honor. One of the grounds, though, or one of the factors the issuing judge has to take into consideration in deciding whether there's a necessity for the wiretap is, in fact, have the traditional investigative techniques been used? What does that have to do with violence? Because another thing is the consideration of whether using these traditional techniques would expose other people or the agents themselves to danger or violence. Okay, to the potential harm to the agents. Is that in the affidavit, or what... Are you just speaking hypothetically, or what? No, the language that I did cite to, Your Honor... Did the affidavit represent that there would be harm to the agents if the wiretaps were not issued? No, the affidavit represented that pursuing traditional investigative techniques, which would include what some of my other counsel have gone over, surveillance, the use of informants, tracking devices, things of that nature, would be too dangerous in light of the circumstances that had been exposed during the investigation. So that language was in there, and I believe in my brief I cited to... Counselor? Yes. You're speaking with quite a broad brush there, that you say the affidavit said these other means would be dangerous under the circumstances, but the government argues pretty strenuously, don't they, that the affidavit didn't link physical dangerousness to necessity. In other words, how do you respond to the government's argument that had you added in the stuff to the affidavit that you want, that they've really never beat anybody up, they're nice guys. How does that change any of the other bases in the affidavit for necessity, since dangerousness wasn't one that was listed as justifying the necessity? Okay. My argument at the district court level was that was one of the circumstances that they represented as bearing on the issue of necessity. But the other things, and I will echo, my client, along with his twin brother, was purportedly the head of the Colbert DTO. There was absolutely none of the traditional investigative techniques used in this particular case against my client, and they had a wide variety of options. Nobody went to California. Supposedly the drugs were being shipped from California. There was none of the surveillance GPS. There was no trash pools. There was no subpoenas. My client at the time was on parole, I believe, which would lower his expectation of privacy regarding any kind of searches that could have been undertaken at that point. They basically ran their investigation from the Akron-Canton area, and they did not do any of these traditional investigative techniques with my client, who was very susceptible to having those different techniques used against him in California. And had they exhausted all of those different type of traditional techniques against him in California, then would be the appropriate time to come to the issuing judge and say, Judge, we tried all of these different things out in California with Darrell Colbert. We're not making any headway, and as a result, obviously it is necessary at this point to get a Title III wiretap. I do believe, though, that when the issuing judge is looking at a 100-page affidavit, which all of these affidavits, I think I totaled them up at one point, the six that I was looking at I think totaled almost 900 pages, give or take. They're going through all the traditional techniques and why they are failing, why they aren't going to possibly be successful in the future, and I did try to address every single one of those from every affidavit. That's why my brief was long in the district court, and I did try to recapture all that in presenting it to this court. But the thing that trumps all of that litany of we can't do any more here and this wouldn't be successful is the fact that in that affidavit there's these indications that we're dealing with a situation where we can't use those traditional techniques further because there is an element of danger. And that's a legitimate, in my opinion, that is a legitimate factor that an issuing judge has to take into account. If this is a totally violent situation that agents would have to put themselves in to follow up on these traditional techniques, that is clearly appropriate for an issuing judge to take that into consideration under the statute and say it is necessary to use the Title III wiretap. These traditional techniques are not going to work and they expose an unreasonable amount of danger to either an agent or an informant for that matter. Okay. Thank you, Judge. All right. Thank you, Mr. Conway. Good morning. May it please the court. My name is Matt Dunn. I've been appointed by the court to represent Wesley Black, Jr. in his appeal of the district court's denial of his motion to suppress evidence obtained from a wiretap application – I'm sorry, from wiretaps – and his motion for a Franks hearing. You've heard arguments today about the lack of necessity, and Mr. Black also argues throughout his briefs that the government did not adequately demonstrate the necessity for the wiretaps. Today, I'd like to focus on one clear and material misrepresentation that was in the January 20, 2012 application for a wiretap, which I believe demonstrates that the necessity requirement was not met. Mr. Dunn, I'm going to ask you, isn't your problem here that you've done an absolutely terrific job in your brief, combing through the affidavits and finding the inconsistency that you've pointed out and that the government tries to explain, but that that wasn't pointed out to the district court? Yes, Your Honor. I do wish that it had been raised at the district court, and it was not. That said, I do not believe Mr. Black has waived his right to argue that on appeal. The Holland case in the Sixth Circuit, which I cite in my brief, says that waiver is an intentional relinquishment or abandonment of a known right. It states that there has to be an affirmative act that shows a party has willfully declined to assert a right. My position is that Mr. Black moved to suppress for lack of necessity at the district court, and he has not, therefore, waived his arguments. May I continue, Your Honor? Thank you. So, briefly, I'll discuss the timeline. On January 13, 2012, the government received, and FBI agents in Canton, Ohio, extensive information, extensive information, about this alleged drug trafficking operation from a confidential source known as CS6. So that's January 13, 2012. It has a great deal of information about the comings and goings of the drug traffickers, how the drugs are distributed, et cetera. On January 20, 2012, an affidavit is filed in support of a wiretap application to expand the investigation. It's extending one wiretap and adding a new one. That has an extensive necessity discussion, and part of the necessity discussion is that confidential sources, that traditional and investigative technique, has been tried but has failed and is not reasonably likely to succeed in the future. That application identifies five confidential sources, CS1 through CS5, and the affidavit says we're continuing to look, but there are no others right now, and a wiretap is necessary. That's what the January 20, 2012, affidavit says. With no mention whatsoever of the virtual treasure trove of information the FBI agents in Canton received a week earlier from CS6. It doesn't even acknowledge that he exists, let alone the information he put forward. Fast forward again to February 28, 2012. That's the first time the government includes the information from CS6, and that's in an application for another wiretap. So, the government responds to this argument in Mr. Black's brief, and I'd like to address some of those arguments. One argument the government makes is that there's not instantaneous knowledge that can be assumed from one, you know, different law enforcement agents in different areas, and of course, that's true, and Mr. Black doesn't argue otherwise, but we are not talking here about an FBI agent in Maine failing to inform an FBI agent in Los Angeles on a timely basis about information. We're talking about FBI agents in what is referred to in the affidavit as the Canton-Akron area, and a drug operation that's allegedly taking place in that area. So, it is reasonable to believe that an FBI agent in Canton, I'm sorry, in Akron, would check with his colleagues prior to filing an affidavit seeking this extraordinary measure of a wiretap, that he would check before swearing that there is not other confidential sources available. So, that's one. The second point I'd like to take on is that the government says there is no evidence that this was some kind of, I believe the phrase is, diabolical conspiracy to withhold the existence of CS6 from the court. And again, of course, Mr. Black doesn't argue that there was any kind of diabolical conspiracy. He didn't have an opportunity at a Frank Searing to cross-examine the affiant. He doesn't know why it was left out, but the fact is, CS6 was not included in the January 20, 2012 affidavit, and that made it inaccurate. Whether or not it was knowingly left out, I believe it was definitely recklessly left out. The standard for recklessness, one of the standards, is whether the affiant had obvious reasons to doubt the accuracy of the information. Here, I believe that if you had a full week and you hadn't checked with your colleagues in the Canton, Akron area about whether there were other confidential sources before swearing that there weren't confidential sources available, I believe that meets the recklessness standard. For this and the other reasons in my briefs, I ask that the court return this to the district court with instructions to suppress or with instructions to hold a Frank Searing. Thank you, Mr. Dunn. Thank you. All right. Thank you. Morning. Morning. May it please the court, opposing counsel, my name is Claire Curtis, and on behalf of the Federal Public Defender, I represent Antwon Logan in this case. I've asked for eight minutes. I'd like to reserve three for rebuttal, please. Antwon Logan is unlike any other defendant in this case. As a minor and localized player, Mr. Logan was swept up in the dragnet of wiretaps that acted as an impermissible initial step in the investigation against him. For that reason, this court should remand this case and reverse the denial of Mr. Logan's motion to suppress. Now, Mr. Logan's case certainly encompasses the now well-worn territory of the necessity requirement, but with a novel perspective. Mr. Logan was not the target of a wiretap. In fact, he was someone who called into one of his co-defendants who was being wiretapped. The necessity that was established or not established for those co-defendants should not automatically transfer to Mr. Logan. While this court has not ever specifically addressed how the necessity requirement should operate with someone who is overheard on a conversation, this court's dicta does suggest that this protection would be an appropriate holding. In United States v. Alfano, this court points out that the dragnet use of wiretaps is inappropriate. Also in United States v. Walcott, this court discusses that the use of wiretaps in a conspiracy that extends beyond more than a few identifiable individuals, such as the case before this court, may not be an appropriate use of wiretaps. In Mr. Logan's situation, because he's such a minor player in this situation, the conduct of the other co-defendants and whether or not their conducts and the investigation against them is sufficient for necessity has been imputed to him, which actually leaves Mr. Logan to the co-defendants. I won't echo the arguments of my colleagues, but I will emphasize that there are a number of traditional investigatory techniques that arguably may or may not have worked for the co-defendants, but would have been more than sufficient to investigate Mr. Logan and his localized very minor participation. For example, by the time the wiretaps were up, law enforcement was already aware of who Mr. Logan was, where he lived, his relationship with the other co-defendants, his cell phone number. Law enforcement had also been successful in getting GPS tracking for his cell phone number, so they were aware of what calls he was making, who the calls were to, the dates of those calls and their duration. While law enforcement points out that they're concerned about physical surveillance for some of these drug kingpins, a low-level player such as Mr. Logan would not have those same risks. Similarly, being able to track his calls and movements for someone who has a minor role would be adequate for law enforcement to determine what would be an indictable offense in his case. For those reasons, the necessity requirement is not met for Mr. Logan. And additionally, I would add that this court has made clear a purely conclusory affidavit is not sufficient. Detective Perrini's affidavit speaks very generally about drug trafficking organizations in general. He talks about the secretive nature of the organization, the lack of a discernible routine, and the fact that the members have to be cautious. Certainly those concerns apply to all drug trafficking and, in fact, all drug dealing. Particularly for Mr. Logan as a minor player, that's just not sufficient for the highly intrusive nature of this wiretap. And if there are no questions, I'll reserve the remainder of my time for rebuttal. Is it an abuse of discretion, though? No, Your Honor. Mr. Logan continues to maintain that the appropriate standard of review here is de novo, with a review for clear error on factual matters. That's based on this court's ruling in United States v. Rice. Thank you. Any further questions? Thank you. All right. We'll hear from the government. Good morning, Your Honor. Your Honor, may it please the Court, my name is Sam Yannucci. I'm an assistant United States attorney from Akron, Ohio. I was government counsel in the proceedings below. The defendant appellants in this case have asserted five assignments of error, and I will briefly address each of those in reverse order to how they appear in the government's brief. Initially, one assignment of error that was raised, but there's been no discussion about here this morning, was Antwon Logan's claim that his plea was not voluntarily, intelligently, and knowingly given. And I would submit to the Court that there is absolutely no evidence in the record that supports that proposition. The district court judge correctly advised Mr. Logan of the statutory maximum, which was life in prison. The district court judge correctly advised Mr. Logan of the mandatory minimum period of incarceration that he faced, which was 10 years, based upon an attribution of 3.5 to 5 kilograms of cocaine, which is not small potatoes. He was not a street corner dealer of a rock of cracked cocaine, but he attributed 3.5 to 5 kilograms of cocaine, which is an amount he affirmatively acknowledged also on the record. That amount of cocaine, plus a prior drug felony conviction, which gave him the enhanced 10-year mandatory minimum. The district court further advised and questioned Mr. Logan about his agreement with the government that his involvement was 3.5 to 5 kilograms of cocaine, and that under the marijuana equivalency table, his base offense level for the United States Sentencing Guidelines would be level 30. Mr. Logan affirmatively acknowledged all of that with sworn statements at the time of the plea. The trial court's obligation is to make sure that a plea is voluntary, and knowingly and intelligently given. In this particular case, everything in the record supports the proposition that the trial judge did in fact do that. There was no misunderstanding by Mr. Logan when he entered his plea. At the time of his sentencing, both he and his counsel acknowledged the fact that they were facing a 10-year mandatory minimum, and quite frankly, your honors, there was just no factual support for that argument. The fourth assignment of error was presented by Dale Colbert, and it involved a claim that the government failed to minimize conversations. The government certainly has an obligation to minimize to the greatest extent possible the interception of non-criminal conversation in a wiretap. The case law with regards to minimization is very clear, and that is that a defendant who wishes to have a hearing and to challenge the government's minimization must point to specific conversations that occurred that were intercepted in which there was not reasonable minimization, but more than that, they must show a pattern of abuse, and that's both a Lawson and the Giacalone cases in the Sixth Circuit. In this particular case, Dale Colbert alleged that there was a failure to minimize conversation, but he pointed to not a single conversation that he said where minimization was not conducted, let alone any pattern of abuse by the government. District Court Judge Patricia Gaughan noted that her denial of a hearing on that particular issue is viewed for abuse of discretion. She noted in her opinion that there was no evidence that was presented to show that the government had failed to properly minimize, therefore the trial court's ruling in terms of not holding a hearing and denying Dale Colbert's minimization claim is appropriate. The third assignment of error relates to probable cause determinations on several of the indictments by Dale Colbert and by Jeremy Duncan. Dale Colbert attacks the March 19, 2012 affidavit and Jeremy Duncan challenges the May 3, 2012 affidavit. As to Dale Colbert and his challenge to the March 19, 2012 affidavit, his claim is basically that the probable cause in that affidavit stems from information provided by the famous CS6, who Dale Colbert says is totally not believable and because he is not believable there was insufficient probable cause to wiretap his particular telephone. Judge Gaughan closely examined that particular affidavit as she did all of the affidavits in this particular case. She noted that the information provided by CS6 was reliable, it was corroborated by independent investigation by law enforcement, and furthermore it was corroborated by the fact, because CS6 had indicated that the Colberts were using an engine block and sending it through a freight shipping company to various locations containing hidden cocaine, it was corroborated by the fact that on March 12, 2012 law enforcement successfully seized 17 kilos of cocaine from an engine block that was delivered to a location in Akron, Ohio. Therefore Judge Gaughan's determination that there was a substantial basis for the issuing judge to find probable cause is accurate, correct, and not erroneous. And as the court has already indicated, the standard of review for the issuance of the Title III wiretap is an abuse of discretion by the issuing judge, and there was clearly no abuse of discretion in this particular case. What is your best authority in that standard of review? What is your best authority for the standard of review of abuse of discretion? Judge, if you would give me just one second. Your Honors, I may not be able to point my finger at it at this particular time. I apologize. I know that in the brief I certainly would have that down. Most of the briefs did not even start with a standard of review. They just went right into whether there was error or not. The issuing, I think in both the necessity and the probable cause determination, the determination of whether there is a substantial basis for the issuing judge to find either necessity or to find probable cause. Again I apologize. I know that in the brief there is notations in case law which indicate that it is a deferential abuse of discretion by the issuing judge. Are we reviewing the magistrate's decision here or are we reviewing the district judge's decision? I think you are reviewing both. You are reviewing the district court's decision. What findings did the district court make that are entitled to deference on appeal? This court's review of the district court's finding of fact is for clear error. But there wasn't the Frank's hearing here. There was not a Frank's hearing with regards to probable cause or necessity. I thought the district court ruled more as a matter of law here. Did he not? Well the district court in finding that there was a substantial basis, no that is correct. But to get to that conclusion of law the district court examined each of the affidavits in light of the complaints of the defendants. What expertise does he have to do that that we don't? Normally when we give a district court deference it is because they are in a special position and are uniquely qualified to review it. How are we not in the same position as the district court to review whether the affidavits themselves establish necessity in these other matters? I think your honor that is your call because that is a de novo review. Alright so I'm still troubled as to why we would give the district judges ruling any deference here at all. Well I'm not referring to Judge Gahn, I'm referring to the issuing judges, their deference. Well it was Chief Judge Oliver on all of the affidavits with the exception of the last one on May 3rd which was Judge Gwinn. The issuing judges is given deference because they are the ones that have broad discretion in determining whether the affidavits show probable cause and or necessity. And as it relates to again Dale Colbert's argument, Judge Gahn, Judge Gwinn and Judge reviewed each of the affidavits, found that CS6's information was correct, noted the fact that based on intercepted conversations the 17 kilograms of cocaine had been seized. By that period of time there had also been seizures of marijuana and $50,000 in currency and the judge determined that the issuing judge in that particular case, which would have been Chief Judge Oliver, had a substantial basis to find that there was probable cause in the affidavit. Jeremy Duncan also attacks the May 3rd affidavit. In that particular claim he alleges, and I want to get this correctly, he alleges that the May 3rd affidavit was based upon quote wholly spurious and damning accusation end of quote and quote simple innuendo and unfounded supposition end of quote. And that was based primarily on the argument that Agent Perini mistakenly interpreted a number of the prior intercepted telephone calls. Again, Judge Gahn looked at that particular affidavit. She noted that Agent Perini was an accomplished and experienced narcotics investigator who had been shown to be able to be reliable in interpreting those calls. That reliability was evidenced by the fact that seizures were made on March 12th of 2012 of the 17 kilos of cocaine as well as subsequent marijuana and money seizures as well. And Judge Gahn concluded that the issuing judge, it was certainly within the issuing judge's discretion to credit the interpretation of Agent Perini and to find based upon those representations made in the affidavit that probable cause could be found. So again, the trial court's, Judge Gahn's decision on that basis is not erroneous. The final two claims are somewhat intertwined. One is Daryl Colbert's claim and request for a Franks hearing below, which he argues as part of his claim that there was no necessity for the wiretaps. And then of course the final argument is the argument shared by all of the defendants that there was insufficient necessity for the wiretaps. As it relates to the Franks hearing, number one, Daryl Colbert was the only defendant who asserted that there were materially false statements in the affidavit and asked for a Franks hearing. Nobody else did so. In addition, Daryl Colbert identified five specific areas of which three, he alleged, were affirmative misrepresentations and two, he alleged, were omissions. Again, as it was already pointed out, the hurdle that Daryl Colbert faces is that he made the allegations, but in contrary to binding Sixth Circuit precedent, which is the Stuart case and the Bennett case, a defendant who is asking for a Franks hearing and who is making material misstatements must accompany his allegation with an offer of proof. He did not do so and that was one of the bases that Judge Gaughan seized upon in not permitting a Franks hearing or denying a Franks hearing in this particular case. In addition, Judge Gaughan examined the affidavits that Daryl Colbert challenged and upon that careful review indicated that it was clear to her that Agent Perrini did not use any of those affirmative statements and argue those as a basis for necessity. In addition, the two omissions which dealt with the fact that during the intercepted conversations there was no discussion of violence and that the government had no information to suggest that the Colberts were engaged in violent conduct, that Agent Perrini should have made an affirmative statement to that fact. However, the intercepted conversations speak for themselves, at least the ones that were made. The Sixth Circuit has held that when you are dealing with omissions, it is a higher standard than dealing with the material misstatements because on omissions it would end up with open and endless conjecture as to facts and circumstances that could have arisen that may at some point have been of some benefit to the government. The Sixth Circuit has been very clear that that is very limited and refers to it as a very rare case. In the end, Judge Gaughan determined that Daryl Colbert had not satisfied the Frank's test of making a substantial preliminary showing that the statements were made and that they were critical or essential to a finding of probable cause or necessity. The final assignment of error deals with the necessity. In that, the defendants make common arguments and it is a mistaken view of what the law is. What the defendants do is they take a look and they individualize the necessity argument. They individualize it to each particular defendant. They isolate each of the particular techniques that are used. They take a hyper use of those traditional techniques and then they come to the conclusion that for the techniques that were being used and that were generating some positive information, well, government you should have just done more of that. And for those conventional techniques that had failed or that the government deemed as reasonably likely to fail if tried, the defendants have said, well, you should have tried those anyway. And that is not what the law is with regards to the standard. My biggest concern in the necessity argument here is where is the limiting principle on your argument and when are we not going to find necessity as you put it. Let me put a couple of examples. Pole cameras won't work because they give you limited information. GPS gives you limited information. If we pull a target in front of a grand jury, they're not going to talk. If we surveil these people, we'll never know what they're really talking about. And as I read the justifications for necessity, why the other ones wouldn't work, I kept coming back to the concern that you could say that about a lot of investigations, a lot of drug investigations, and then rather than becoming a true necessity and an exception, if we accept these arguments here, how can we not apply them really across the board? Where's the limiting principle here? Well, number one, Your Honor, we did a lot of those. In terms of pole camera, we had pole cameras up. Agent Perini advised the judge that we put pole cameras up and that pole cameras did not provide us with the type of information that would allow for a successful prosecution of the organization. The GPS tracking, I know Mr. Vey on behalf of Mr. Duncan said, well, you didn't put a tracker on Jeremy Duncan's truck. Well, but we had GPS tracking of his telephone as well as GPS tracking of Daryl Colbert's telephone, of Dale Colbert's telephone, of Dante Branch's telephone. So we were trying and utilizing those particular traditional techniques, but they were not providing us with the information. My concern with your argument is that it seems that if you push your argument to the logical conclusion, those techniques are never going to provide you with the information that you say you need to get where you need to go. The tracking, the information is always going to be simply what it was here, where the folks were going. The pole camera is never going to tell you what the folks were saying. So again, if we accept your argument here and I go back to Detroit and the agents throw up a pole camera and follow some people around and they come in to me and they say, it didn't work. We're exactly where they were in the right case. Are we setting a blueprint that doesn't prove too much, I guess is my concern. Convince me it doesn't. No, because number one, you're not going to be viewing that in isolation. I mean, what the Title III law says with regards to necessity is that the government should make known the difficulties of traditional investigative techniques. And certainly at some point, and I can't tell you at the beginning, but at some point you are going to reach a point where the surveillance along with the use of force, the use of force intercepted calls that you already have in conjunction with GPS tracking, in conjunction with a number of these conventional, traditional investigative techniques, you're going to reach a point. And I think the Walcott case talks to that a little bit, that at some point the government can't just keep going doing the same thing. But, especially at the outset of an investigation, and when, as was the case in this particular case, the government is not just totally dismissing it out of hand, we were conducting surveillance, we had GPS tracking, we executed search warrants on the engine block when it was prudent, when it was, when there was an opportunity to do that. So I guess the best I can say, Your Honor, is that at some point what you indicate is accurate or is true, but it certainly was not the case here. Agent Perini notified the court at every stage as to what was happening, both in terms of traditional investigative techniques, the expanding investigation, and the fact that based upon the new investigation and the people and the organization, that the necessity, that there was a necessity for the wiretap. I hope I answered your question. Where do you draw the line between necessity and preference? At some point during the investigation your folks develop information that the drugs are coming from Ortega's in California to the place in Akron. And it seemed to me that at some point they could have executed a search warrant and gotten 17 kilograms, some large amount. And they did do that at some point. But I also understood them to be saying, for a while we didn't want to pull the trigger on a search warrant because we wanted to go bigger, we wanted to get broader. Is there a point at which their desire to go broader becomes a preference rather than a necessity? I would say yes, but not in this particular case. I mean, in this particular case, after the 17 kilo seizure was made, you know, there were additional conversations that suggested that the Colberts, number one, they weren't involved in more than just the cocaine aspect, they were also shipping marijuana to the Akron area, and that was a different aspect of their particular organization. We were, there was indication that they were attempting to get additional amount of cocaine, which is not unusual in the drug area. If there's a seizure, you go back to the supplier and you say, we lost that shipment, give us some more drugs and we'll be able to make it up. So at that point in time, the government was looking to expand the investigation, if we could, to their cocaine supplier, also to their marijuana supplier, which was different, and also to follow their marijuana trafficking organization and endeavor in the Akron-Canton area. Along with that, we have the second drug trafficking organization that was also at work, that involved Dante Branch, who was the common thread for both DTOs. And so the agent and the government are juggling, you know, the two investigations. Now, again, at some point, you know, you can't keep doing that, but I think that's a finding that the issuing judge, in his discretion, can make. Your Honor, with regards to the necessity, I would only indicate that, just a couple of things. Dale Colbert attacked the necessity of the two initial intercept orders on Louis Harmon's telephone. Judge Gahn indicated that they had no standing to do so. So the first two wiretap intercepts, Dale Colbert's claim that there was a lack of necessity, he doesn't have standing to challenge that. And in addition, the necessity is tested in a practical and common sense fashion. The government's burden is, this is just standard law in the Sixth Circuit, the government's burden is to inform the judge of the difficulties of the conventional techniques, and that's the Stewart and Alfano and Landmesser case. And, you know, the biggest thing is that you are not to foreclose every conceivable, or not to foreclose wiretapping until every conceivable or imaginable traditional investigative technique is exhausted. And that's basically what the defendants try to argue when they come to the court and they say, well, Antoine Logan, you might have had GPS tracking on everybody else, but you didn't have GPS tracking on me. And they try to individualize it, but that's not what the law is, because if that were the standard, there never would be a position where you'd be able to get a Title III wiretap. Unless there are any other questions, Your Honor? Thank you. Ms. Curtis, you've got three minutes rebuttal? Or do you have rebuttal, too? Yes, Your Honor. I have one minute remaining, and I apologize that I didn't inform the question. All right, go ahead. Your Honor, I'll be very brief. I just wanted to respond. You had asked questions about what the standard of review is for an issuing judge's decision. I quoted in my brief, the Rice case is very clear on that. In reviewing the validity of an electronic surveillance order, we will accord great deference to the determinations of the issuing judge. However, this deference does not logically apply where the issuing judge is given misleading information in the wiretap application or supporting affidavits. That's U.S. v. Rice. Doesn't the misleading application go to the Franks hearing, that there wasn't a Franks hearing here? Your Honor, in the Rice case, this falls under the discussion of the review of the necessity requirement, not a review of whether or not there should be a Franks hearing. But yes, Your Honor. Because there's no appeal, that issue, right? As to whether or not there should have been a Franks hearing? Mr. Black does appeal whether or not there should have been a Franks hearing, for the reasons stated in his brief. Thank you, Your Honor. Thank you. Briefly, Mr. Logan's individual situation highlights the concerns that Judge Liepman identified for the government. And in fact, the government acknowledges, under this Court's authority in Walcott, that there is a point where the nexus between necessity and preference becomes an issue. Mr. Logan was readily identifiable as a minor participant, as a fringe participant in this organization. And in fact, Detective Perini's own affidavit states as much, that Mr. Logan's participation is at the Akron level only, that he's peripheral, that he's not, that he's most likely not aware of the interstate extent of the organization. Moreover, this Court is addressing whether or not the District Court should have granted or denied the motion to suppress. That is a de novo standard of review under this Court's precedence in United States v. Rice. This is not a question of whether we go all the way back to the wiretaps, this is simply Judge Gahan's determination as to the motion to suppress. And finally, I would note for the Court, Mr. Logan's second ground for relief regarding his plea, the record does clearly demonstrate there are three different amounts given at three different times. The indictment, two different quantities listed in the plea agreement, and a different amount listed at sentencing. Of course... Those quantities make perfect sense. I mean, as I understood your plea argument, it was if there are different numbers, there must be confusion. But the numbers, when I looked at it, seemed to make perfect sense. He pled to an offense of 500 or more, and he indicated that for sentencing guideline purposes, it's going to be 500 grams was the first number, that's the statute, and for sentencing guideline purposes, I'm going to be held accountable for 3.5 to 5, I think was the number. There's nothing inconsistent or confusing about that. The statutory offense, that number is triggered by 500, and I'm agreeing to be held accountable for more. What is confusing or not knowing about that? Your Honor, Mr. Logan would disagree with that assessment. There are not only three different numbers given, which would be confusing for any defendant, and of course, the element, the quantity is an element of his offense. But also, whether it was 5K or more would have potentially triggered a statutory, mandatory minimum of 20 years, so it's particularly significant for Mr. Logan to understand exactly how much it was that he was pleading to. Therefore, Mr. Logan would respectfully ask that this Court reverse the denial of his motion to suppress, and or find that his plea was not knowing, intelligent, and voluntary. Thank you. Further questions? All right, thank you, Ms. Curtis. I note that four of the defense counsels, four of the defense counsel are appointed pursuant to the Criminal Justice Act, Mr. Conway, Mr. McDonald, Mr. Dunn, Mr. Vey, and the Court thanks you for your service in this case and for representing your clients vigorously. With that, the case will be submitted.